In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
NEW ALBANY DIVISION

| | |
|---|---|
| **JULIE A. GATEWOOD BOOKER**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 4:08-cv-097-SEB-WGH |
| | ) |
| **MICHAEL J. ASTRUE**, Commissioner of | ) |
| the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**E N T R Y**

This case is an appeal from a final decision of the Commissioner of Social Security denying Plaintiff disability benefits. Our standard of review is deferential: courts must uphold decisions of the Commissioner if his factual findings are supported by substantial evidence in the record and no material error of law has occurred. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it constitutes substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the fact that Congress has designated the Commissioner, not the courts, to make disability determinations.

In reviewing the decision of the ALJ, we cannot engage in our own analysis of

> whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months".  42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(3)(A).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process.  42 USC §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The SSA has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 C.F.R. §§ 404.1520 and 416.924.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  *Id.*  At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the claimant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and

2

416.924(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545 and 416.945. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

    The burden rests on the claimant to establish steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If a claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate a claimant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. 20 C.F.R. §§ 404.1569 and 1569a. If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs existing in the economy for a person

with the claimant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may still be used as an advisory guideline in such cases.  20 C.F.R. § 404.1569.

In May 2004, Plaintiff Julie Gatewood Booker applied for disability benefits under both the Disability Insurance and Supplemental Security Income provisions of the Social Security Act, alleging a disability commencing in February 2002, due to various physical and mental impairments.  (R. 98).  The state agency denied her application on initial review in August 2004, (R. 62), and on reconsideration review in November 2004, (R. 57).  Ms. Booker requested and received a hearing before an ALJ, which was held in January 2007.[1]  (R. 713).  The ALJ issued his decision finding her not disabled in April 2007, (R. 24), and the Appeals Council denied her request for review in April 2008, (R. 16), thus rendering the ALJ's decision the final decision of the Commissioner on her application for benefits.

The ALJ found that Ms. Booker met the insured-status requirements of the Act through the date of her alleged date of disability.  (R. 26).  At step one of the sequential evaluation process, he found that she had not engaged in substantial gainful activity since her alleged onset date.  (*Id.*)  At step two, the ALJ found that Ms. Booker suffers from the following severe impairments:  depression, borderline personality disorder, post traumatic stress disorder, status post fracture of the lower back, obesity, carpal tunnel syndrome, and migraine headaches.  (*Id.*)

---

[1] Under an arrangement with the federal Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of the state government:  the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal Social Security

At step three, the ALJ found that she does not have an impairment or a combination of impairments that meet or equal any of the Listing of Impairments.  (*Id.*)

The ALJ then determined Ms. Booker's RFC for steps four and five of his evaluation. He found that she retained the capacity to perform light-level work with various exertional limitations.  The only non-exertional limitations that he found were that she is limited to "simple and repetitive tasks with no more than superficial interaction with the general public, co-workers or supervisors." (R. 27).  At step four, the ALJ found that Ms. Booker could not perform her past relevant work.  At step five, because he determined that Ms. Booker's non-exertional mental impairments impeded her ability to perform all or substantially all of the requirements of work at the light level, the ALJ obtained the testimony of a vocational expert at the hearing on the number of jobs existing in the economy that Ms. Booker could perform.  (R. 35).  Given Ms. Booker's age (32 years at her alleged date of disability onset), education (high school), work skills (not an issue in her case), and the RFC determined by the ALJ, the VE testified to the number of jobs in the national economy that are available to such a person.  The ALJ found the number of jobs to be significant and therefore concluded that Ms. Booker was not disabled.  (*Id.*)

Ms. Booker was born in 1969.  Although she dropped out of high school after the ninth grade, (R. 717),[2] she obtained a GED in 1998, (R. 158, 195).  After leaving high school in about 1987, she worked off and on for 13 years as a certified nursing assistant in nursing homes and assisted-living centers, helping patients with custodial care.  (R. 154, 172-73, 733).  She attended

---

[2] Ms. Booker reported that, when, at age 16, she told her mother about her sexual abuse, her mother kicked her out of the house.  (R. 671).

about a year of LPN training in 2001 but did not complete the program. (R. 195, 717). She has also held short-term jobs as a temporary worker and laborer, (R. 139, 139A, 154, ), but has not worked at the level of substantial gainful activity since her alleged disability-onset date of February 2002, (R. 26, 152, 187, 190). She has been married four times and has three children.

## Evidence

Because, as discussed below, Ms. Booker argues two discrete errors in the ALJ's decision regarding only her mental impairments and limitations, we do not address the evidence relating to her alleged physical impairments.

**1994 Hospitalizations.** Ms. Booker was hospitalized from July 6 to 18, 1994 because of suicidal thoughts and depression. (R. 465). She reported a history of sexual abuse by her father, an uncle, and a couple of friends from the age of 6 to about 13, or from 1st to 8th grades; chronic depression and suicidal thoughts since the age of 15; and a suicide attempt about three weeks before admission during a bout of depression. Her discharge diagnoses were major depressive disorder, single, severe, without psychotic features; post-traumatic stress disorder (PTSD); and borderline personality traits. Her psycho-social stressors were rated as severe. (R. 466). Her global assessment of functioning at admission was rated as 35, (R. 467), and at discharge as 50, (R. 466). The global assessment of functioning (GAF) is a scale from 0 to 100 that rates an adult's social, occupational, and psychological functioning. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision, 4th ed.* ("*DSM-IV-TR*") 32-34 (2000). A score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) OR

major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* A score between 41 and 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.* A score between 51 and 60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* She was prescribed medication for depression and insomnia. Her children were apparently visiting, or traveling with, her ex-husband in California at this time.

She was readmitted eight days later, on July 27, 1994, after she made repeated phone calls reporting distress caused by flashbacks of childhood trauma, increased suicidal thoughts, sleep disturbances, and headaches. (R. 462). Her psychotherapeutic medication was increased. She was discharged on August 1, 1994 after reporting no further suicidal ideation and was instructed to follow up with outpatient therapy.

Ms. Booker was readmitted on August 11, 1994 following an overdose of Paxil, Ambien, and Xanax. (R. 472). She reported that the overdose was brought on by the pressure of her ex-husband wanting to get back together. She also reported continued flashbacks of her ex-husband's sexual and physical abuse. She was discharged four days later. The diagnoses were PTSD, major depressive disorder, recurrent, and dysthymia, with borderline personality disorder. Her GAF was assigned as 40.

She was readmitted on September 7, 1994 with reports of increased flashbacks,

depression, suicidal ideations, and increased thoughts of hurting herself.  (R. 461).  She reported that these problems were brought on by the stress of her children's impending return from California.  The expected length of stay was one week.  Her admitting GAF was 35.

**GED and work.**  As noted above, after her 1994 hospitalizations, Ms. Booker earned her GED in 1998, attending about a year of college-level LPN training in 2001, and was working at the level of substantial gainful activity, but she did not work at the SGA level after her alleged onset-of-disability date of February 2002.

**First Christopher evaluation.**  Ms. Booker filed a previous application for disability benefits which was denied on initial state-agency review in May 2003 and which she did not further pursue.  (R. 161, 337).  As part of its evaluation of her application, the state agency sent Ms. Booker in March 2003 to Dr. Jill A. Christopher, Psy.D., HSPP, a licensed clinical psychologist, for a consulting mental-status evaluation.  (R. 351).  Dr. Christopher recorded Ms. Booker's reports of chronic depression; childhood sexual abuse for 8 years beginning in the first grade; nightmares; flashbacks; mood swings; poor sleep; and suicide attempts, the last in 1995.  Dr. Christopher diagnosed her with major depressive disorder, single episode, moderate; and PTSD.  She rated Ms. Booker's current and highest-past-year GAFs as 48.

**Karkut evaluation.**  In July 2004, Dr. Richard T. Karkut, Psy.D., HSPP, a licensed clinical psychologist, performed a mental status evaluation at the request of the state agency as part of its evaluation of her current application for benefits.  (R. 269).  He recorded that Ms.

Booker reported that she was not taking any medications[3] and was not in psychotherapy. Her reported symptoms were consistent with her earlier reports, but she added that her memories of past abuse had been brought back more frequently due to the abuse of her own children and the ensuing legal battles. Dr. Karkut diagnosed Ms. Booker with major depressive disorder, single episode, moderate. He rated her current GAF as 55 and her highest-past-year GAF as 60. A GAF of 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *DSM-IV-TR* 34.

**Pressner evaluation.** In August 2004, state-agency psychologist J. Pressner, Ph.D., completed a mental RFC assessment of Ms. Booker. (R. 250). Dr. Pressner interpreted Dr. Karkut's evaluation as indicating no severe deterioration at that time and noted Dr. Karkut's report that Ms. Booker was not taking any medications and was not in therapy. Dr. Pressner noted that Dr. Karkut did not provide a medical opinion but assigned a GAF of 55 which Dr. Pressner interpreted as indicating no worse than moderate deficits. Dr. Pressner concluded that Ms. Booker retained the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodation, but that she could not work with the general public or in jobs requiring intensive interpersonal contact with others.

**Quinco Behavioral Health Systems.** Ms. Booker reported to Quinco to begin psychotherapy treatment in August 2004. (R. 213). Her intake diagnoses were recurrent

---

[3] Apparently, this was an error. At an examination a few days later, Ms. Booker reported her medications, (R. 243), and subsequent medical reports record her taking medications, including psychotherapeutic medications.

depression, non-psychotic, moderate; and borderline personality disorder. (R. 215). A GAF of 55 was assigned. Her treatments lasted for about four months. A GAF of 55 was assigned in September 2004. (R. 521). A licensed clinical social worker noted on a November 2004 visit note that she did not see Ms. Booker as totally disabled. (R. 513).

**2006 hospitalizations.** In April 2006, Ms. Booker presented to the emergency room of the Schneck Medical Center in Seymour, Indiana with reports of not wanting to live anymore and suicidal thoughts. (R. 538). She also reported visual and auditory hallucinations. She was admitted with a diagnosis of major depression with psychotic features, suicidal ideation, and borderline personality disorder. (R. 538, 540). She was discharged later the same day in her daughter's care for transport to Columbus, Indiana for admission to a behavioral health center.

Ms. Booker was admitted to the Columbus Regional Hospital from April 2 to 4, 2006. (R. 589). Ms. Booker reported visual and auditory hallucinations, arguing with her 18-year-old daughter, and suicidal ideation. She was felt to be a danger to herself and others. (R. 608). Her admission and discharge diagnoses were major depression, recurrent, with psychosis; and borderline personality disorder. (R. 576, 589). She was assigned a GAF of 25. (R. 608). A GAF of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.*, stays in bed all day, no job, home, or friends)." *DSM-IV-TR* 34.

**Second Christopher evaluation.** On April 13 and 26, 2006, Ms. Booker was evaluated by licensed clinical psychologists Jill A. Christopher, Psy.D., HSPP., and Susan Connors, Ph.D.,

HSPP. (R. 669). The psychological evaluation was conducted at the request of Ms. Booker's lawyer. Ms. Booker reported auditory and visual hallucinations, feelings that people were following her, and sexual abuse by her father from the first to the eighth grades. Drs. Christopher and Connors administered a range of six psychological tests. The Beck Depression Inventory score of 42 indicated extreme depression and the Beck Anxiety Scale of 34 was in the severe range of anxiety. Her overall intellectual skills were in the low-average range. Their diagnoses were major depressive disorder, recurrent, severe with psychotic features; and borderline personality disorder. (R. 674). Drs. Christopher and Connors assigned Ms. Booker a present GAF of 35.

## Discussion

Ms. Booker does not challenge the ALJ's findings at steps 1 through 4. In a well-argued, concise, and focused brief, she contends only that the ALJ committed legal error in making his RFC determination regarding the limitations imposed by her mental impairments. She does not challenge any of the findings regarding her physical impairments or limitations. Specifically, she argues that the ALJ committed two errors: first, that the ALJ failed to articulate his evaluation of Dr. Christopher's 2003 opinions of Ms. Booker's mental status and, second, that the ALJ's reasons for rejecting the 2006 opinions of Drs. Christopher and Connors were illogical and inaccurate. She asks for a reversal and remand.

**Dr. Christopher's 2003 assessment.** The ALJ summarized Dr. Christopher's 2003 report of his assessment of Ms. Booker's mental status, which was performed at the request of the state agency, but he failed to articulate his analysis or evaluation of that assessment. Dr.

11

Christopher's expert opinion was that Ms. Booker's current and highest-past-year GAFs were 48. As explained above, this rating indicates serious symptoms or any serious impairment in social or occupational functioning, such as the inability to keep a job. *DSM-IV-TR* 34. It is well-established that the ALJ was required to articulate his evaluation of this relevant and substantial evidence, not merely recite it. 20 C.F.R. § 404.1527(b); S.S.R. 96-5p; *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

The Commissioner argues that Dr. Christopher's evaluation was an unreliable assessment because, as Dr. Christopher and the ALJ both noted, Ms. Booker had not taken her medications for two and one-half months prior to the evaluation because she could not afford them. But while it is true that both Dr. Christopher and the ALJ noted the lapse in medications, neither of them expressed any opinion — or even a suggestion — that the lapse rendered the evaluation unreliable. Thus, the unreliability of Dr. Christopher's assessment is the Commissioner's own *post-hoc* rationale, not the ALJ's, and, as such, does not factor into our review; we review the ALJ's reasons expressed in his written decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ committed error and must articulate his evaluation of Dr. Christopher's 2003 medical opinion of Ms. Booker's mental status.

**Dr. Christopher's and Dr. Connors' 2006 assessment.** Drs. Christopher's and Connors' broad evaluation of Ms. Booker's mental status, including the administration of six standard psychological tests showing severe impairments and limitations, was a substantial piece of evidence. Their medical opinion, summarized in the assignment of a GAF of 35, indicating major impairment in several areas such as work, judgment, and thinking, and encompassing the

12

inability to work, required focused evaluation by the ALJ and clear articulation of his reasons for discounting or rejecting it. The ALJ's only articulated evaluation of their assessment was:

> The examiner to whom the claimant was referred by her attorney found she had a severe psychotic depression complicated by a borderline personality disorder which left her quite impaired. This conclusion is not consistent with the other test results and she has not been receiving treatment commensurate with such a severely disabling diagnosis. As noted, the only hospitalizations were in 1994, except for the short stay in 2006, which was reported to be as a result of an altercation with her teen-age daughter. She was discharged the day of admission and spent only two days in a mental health facility.

(R. 33).

The first reason the ALJ gives for rejecting Drs. Christopher's and Connors' opinion is that it is "inconsistent with the other test results." Because the only possible "test results" in the record are the GAF scores assigned by various medical sources and the six diagnostic tests administered only by Drs. Christopher and Connors, the ALJ can be referring only to the GAF scores. While it is true, as argued by the Commissioner, that a GAF score is not technically a "test result," but is a "clinician's judgment of the individual's overall level of functioning", *DSM-IV-TR* 32, and, therefore, a subjective measure, it nonetheless represents an expert medical opinion of a person's level of functioning and, in this case, the only possible finding to which the ALJ could be referring. The eleven current assessments of Ms. Booker's GAF in the record, in scale order, are: 25, 35, 35, 35, 40, 40, 48, 50, 55, 55, 55. In date order, the scores are: 35 (7/1994), 50 (7/1994), 40 (8/1994), 40 (8/1994), 35 (9/1994), 48 (3/2003), 55 (7/2004), 55 (8/2004), 55 (12/2004), 25 (4/2006), and 35 (4/2006). As discussed above, a score of 50 or below indicates increasingly serious, major impairments and inability to keep a job. Only three of the scores are above 50 and three of the six post-onset-date GAFs are below 50. There is no

13

pattern, other than the fact that most scores are 50 or below. With such a broad range of scores, varying markedly over time, each of the GAF scores is "not consistent with the other" scores. When the scores are inherently inconsistent, the ALJ's "inconsistency" rationale does not make sense.

The ALJ also discounted Drs. Christopher's and Connors' assessment because Ms. Booker "has not been receiving treatment commensurate with such a severely disabling diagnosis" but he cited no medical evidence or opinion in the record indicating the level of treatment that is expected or required for a person with such a diagnosis. As noted above, there was no medical expert testimony at Ms. Booker's hearing. The only indication of the treatment standard that the ALJ had in mind was his immediately following comment on the lack of recent, long-term (more than two days) hospitalization. But whether the functionally disabling severity of a mental disorder is shown only by recent, long-term hospitalization treatment is itself an expert medical judgment which the ALJ cannot and may not make on his own. *See Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Steele*, 290 F.3d at 941; *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995).

Immediately following the passage quoted above, the ALJ made additional comments that also might have been directed at discounting Drs. Christopher's and Connors' 2006 assessment:

> I do not give controlling weight to the responses on the mental status evaluation. It suggests that her low intellectual abilities combined with her mental disorders would preclude her functioning in the workplace. However, this is totally contradicted by the claimant's actual educational and employment pursuits. She did quit school as a freshman, but returned to get her GED, then went on to study nursing and worked as a certified nursing assistant for fifteen years. She does not

> allege that she stopped work due to any mental issues, and I further note that she did her own divorce and is interested in reading and music. She is the sole caretaker of three children, two of which are handicapped mentally.

(R. 33). First, we will assume that the ALJ intended "mental status evaluation" to refer to Drs. Christopher's and Connors' 2006 assessment and that "the responses" thereto actually refers to their conclusions, in other words, their expert opinions on what their tests revealed about Ms. Booker's mental status. He discounts their opinion that she cannot function in the workplace because she obtained her GED, attended one-year of LPN training, and worked as a certified nursing assistant for fifteen years. But all of these pursuits occurred before her alleged onset of disability and the evidence indicates that her work history is not static – in fact, becoming less so with time — just as her mental impairments are alleged to be not static. The ALJ cited to no evidence indicating the nature of the effort involved in Ms. Booker obtaining her GED in 1998; the nature of her effort in 2001 while attending the one year of LPN training, or her success at that effort; or the nature of her work as a certified nursing assistant providing custodial care; and he failed to cite expert medical evidence showing that such efforts are inconsistent with Drs. Christopher's and Connor's assessment of her mental status and limitations. Ms. Booker alleged that her mental limitations progressively interfered with her work ability until she was unable to maintain employment by her alleged onset date, (R. 98, 153-54, 509), but the ALJ fails to acknowledge the sporadic and progressive nature of her impairments and limitations in his decision. Finally, the ALJ cited no evidence in the record indicating the nature of Ms. Booker's divorce proceedings, the nature of her enjoyment of music and reading, or the effort required to care for her children to support his bare assumption that these activities and interests are inconsistent with Drs. Christopher's Connors' opinion that Ms. Booker is not capable of

15

sustained functioning in a workplace setting.

The ALJ's stated reasons for rejecting Drs. Christopher's and Connors' 2006 assessment are not supported by substantial evidence and constitute legal error.

## Conclusion

The Commissioner's decision is not supported by substantial evidence and is based on legal error as set forth above. His denial will be REVERSED and Plaintiff's case will be REMANDED to the Commissioner for re-evaluation consistent with this Entry.

Date: 09/15/2009

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com